# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

*- FILED -*
APR 21 2020
At _____ M
ROBERT N. TRGOVICH, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

[*Use this form to sue for employment discrimination. NEATLY print in ink (or type) your answers.*]

TERRY L. LYMON ,
[*You are the* **PLAINTIFF**, *print your full name on this line.*]

v.

UAW LOCAL UNION #2209 ,
[*The* **DEFENDANT** *is who you are suing.*]

Case Number  1:20CV 169 HAB
[*For a new case in this court, leave blank.
The court will assign a case number.*]

[*The top of this page is the caption. Everything you file in this case must have the same caption. Once you know your case number, it is VERY IMPORTANT that you include it on everything you send to the court for this case. DO NOT send more than one copy of anything to the court.*]

## EMPLOYMENT DISCRIMINATION COMPLAINT

1. My address is: 2418 PALISADE DR. FT. WAYNE, IN 46806

2. My telephone number is: (260) 804-4010

3. The Defendant's address is: 5820 EAST 900 NORTH ROANOKE, IN. 46783

4. This action is brought for employment discrimination pursuant to:

    ● Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.
    [race, color, gender, religion, national origin]

    ○ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 to 634.

    ○ Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112 to 12117.

    ● Other: NLRA 29 U.S.C. 151-169

5. I filed a charge of discrimination with the Equal Employment Opportunity Commission or the Indiana Civil Rights Commission on: APRIL 13, 2012

6. The date on my Notice of Right to Sue letter is: MARCH 27, 2020

7. The date I received my Notice of Right to Sue letter was: MARCH 31, 2020

[*DO NOT write in the margins or on the back of any pages. Attach additional pages if necessary.*]

## CLAIMS and FACTS

DO: Write a short and plain statement using simple English words and sentences.

    **DO NOT:** Quote from cases or statutes, use legal terms, or make legal arguments.

DO: Explain when, where, why, and how the defendant discriminated against you.

DO: Include every fact necessary to explain your case and describe your injuries or damages.

DO: Number any documents you attach and refer to them by number in your complaint.

    **DO NOT:** Include social security numbers, dates of birth, or the names of minors.

DO: Number your paragraphs. [*The first paragraph has been numbered for you.*]

1. Plaintiff, Terry Lymon (Lymon) was employed by General Motors on May 8, 1995 (Ex. 1.) During the year, 1998 Lymon sustained a severe back injury while working at GM (Ex. 5). This back injury resulted in a workers compensation claim which was handled by Plaintiff (Lymon's) attorney, David M. Lutz LLP. (Ex. 2). Due to the injury, Lymon had been working various jobs in the GM plant that were compatible with the type of injury that Lymon sustained, and that were compatible to the restrictions given to Lymon by his doctors. (Ex. 3 Ex. 4). GM medical doctor, Carlos Espinosa (Espinosa) had accepted Lymon's work restrictions and Espinosa's clinic visit medical notes indicate that he used Lymon's restrictions to find compatible jobs that he could perform (Ex. 6). Exhibit 4 indicates that Lymon had the restrictions, no lifting more than 10 pounds, no repetitive movement of upper extremity for at least 2 years prior to his termination. (Ex. 4)(Ex. 6).

[*DO NOT write in the margins or on the back of any pages. Attach additional pages if necessary.*]

2)      On June 10, 2004 Plaintiff, Lymon was called by GM Management (Ella Hogan) and told to return to the plant because there was a job available that was compatible with Lymon's restrictions.( Ex. 7). On June 14, 2004 Lymon returned to the GM Plant where he was placed on the Latch Install Job on the Box Line located in the Paint department.(Ex. 1, Ex. 7). Lymon went on the Latch Install job and tried to perform it for approximately 2 hours even though it was not compatible with his restrictions.(Ex. 1, Ex. 7). Lymon went back to the plant medical department and informed the plant medical Dr. Espinosa that he could not keep up on the job because of his disability, and that the repetitive twisting that was required to perform the job cause him a great deal of pain. Lymon also informed Espinosa that the latch Install Job was not compatible with his restrictions. Espinosa's clinic notes prove that he had accepted Lymon's restrictions. the earliest date being 07/29/2003. (Ex. 6). However, Espinosa informed Lymon that he was no longer accepting the restrictions given to Lymon by his doctors. Lymon was sent home by Espinosa. (Ex. 6,4,3,1,7).

3)      On July 21, 2004 Plaintiff, Lymon was sent a paragraph 64(d) letter informing him to return to work in 5 business days.(Ex. 8). The rules of the National Agreement, paragraph 64(d) requires that the employee return to the plant in 5 business days, and that he have a satisfactory reason for being off.(Ex. 9). On July 28, 2004, Lymon returned to the GM plant within the 5 working days, and he submitted his doctors excuse to the personnel department in which they accepted. (Ex. 7, p.2, 2nd para., Ex. 1 p.1 2nd para.). Lymon proceeded to the medical department with his restrictions where he was met by the plant medical doctor Espinosa, and GM

Manager, Ella Hogan (Hogan). Lymon was taken back to the same Latch Install Job on the Box Line in the Paint Shop by Hogan. Lymon was given an ultimatum by GM Manager, Ella Hogan to either do the Latch Install Job or she was going to fire him. Lymon informed Hogan that he was not refusing to do the job, but he could not perform the job due to his disability (on the job injury). On that day, July 28, 2004, Lymon was terminated by GM Manager Ella Hogan because he could not perform the previously assigned, Latch Install Job due to his disability. (Ex. 1,5,7).

4) Lymon was a dues paying member of the UAW Local Union 2209 (Union) since his seniority date of May 8, 1995, and he was in good standing. The Local Union 2209 (Committeeman, Dave Matthews) was called at Lymon's request when he was terminated on July 28, 2004. (Ex. 1 p.1, para. 3). Lymon requested that the union, in accordance with the National Agreement, write a grievance for his termination but Committeeman Dave Matthews refused to do so. (Ex. 10). The Local Union 2209 discriminated against Lymon and subjected him to unfair labor representation by refusing to write a grievance for Lymon's termination. Exhibit 1, Union's Statement of Unadjusted Grievance has a date of origin as, November 5, 2004, and exhibit 7, Management's Statement of Unadjusted Grievance has a date of origin as, November 12, 2004, and Lymon was terminated on July 28, 2004. The dates of origin of these documents indicate that they were fabricated 4 months after Lymon was terminated, due to the unions refusal of fair representation for Lymon at the time that he was terminated. (Ex. 1,7). The union subjected Lymon to race discrimination and unfair labor representation when on June 14, 2004, GM Management put Lymon on a job and he could not perform the job due to his injury.

Then, GM Management, on July 28, 2004 ordered Lymon back to work, revoked his restrictions and put him back on the same job (Latch Install Job) that they knew that he could not perform, and then GM management took adverse action against Lymon because he could not perform the job due to his disability, and the union refused Lymon representation. (Ex. 1,5, 4, 3, 7).

5)   The Local Union 2209 discriminated against Lymon based on race and they refused Lymon fair labor representation by refusing to write a grievance for Lymon's termination and for GM management terminating Lymon for a medical disability. Similarly situated, Caucasian female, Linda Berning, was afforded fair representation when the Local Union 2209 wrote two grievances for Berning, one written on October 1, 2002 grievance No. D30957 and the other grievance was written on October 22, 2002 grievance No. D29689.(Ex.11, Ex. 12). Similarly situated, Caucasian male, Jonathon Burget, was terminated by GM management on June 2, 2011, and the Local Union 2209, immediately wrote Burget a grievance for his termination. (Ex. 13). Similarly situated, Mark Burbrink, Caucasian male , was also terminated by GM in 2004 and the Local Union 2209 wrote Burbrink a grievance for his termination. Burbrink was terminated the same year as Lymon.(Ex.14). Exhibit 14 is the Local Union 2209's Third Step Settlement Summary sheet.(Ex.14). This is a list of all of the grievances and their status. Page 2 of this document shows that Burbrinks grievance was collectively bargained by the Local Union, (Shop Chairman, Dave Matthews) and GM Management, and Burbrink was returned to work on conditions of employment.(Ex. 14, p. 2). Similarly situated, Caucasian female, Ami Reveal (Reveal),  was terminated by GM management on 04/22/2014.(Ex.15 p.2, para. 2). The Local Union 2209

immediately wrote Reveal a grievance for her termination. Exhibit 15 is a certified letter sent to Ami Reveal from the Local Union 2209 informing her that her grievance had been collectively bargained with GM Management, and that Reveal was to return back to work on conditions of employment. (Ex. 15 p. 2, para. 2). Reveal remained terminated for 4 years before she was returned to work, from 4-22-2014 to 8-22-2018 (Ex. 15 p.3). The Local Union 2209 discriminated against Lymon based on race, and denied him fair labor representation by refusing to file a grievance for Lymon's termination, and they refused to collectively bargain with Lymon's employer (GM) to get his job back as was done in the case of Ami Reveal and Mark Burbrink (Ex.14, Ex. 15).

6) Plaintiff, Lymon was subjected to race discrimination and unfair labor representation when he was terminated and the union refused to represent him. Lymon was terminated on July 28, 2004 (Ex. 7 p. 2 para.3). The Local Union refused to represent Lymon when GM and the Local Union agreed to order Lymon to go and see an Independent Medical Examiner (IME)(IMO) without a grievance written that stated why the IME was necessary.(Ex. 17, Ex. 7, Ex. 1). Committeeman, Dave Matthews stated in his testimony that a grievance must be written before an employee is sent to see an IME, because the IME procedure takes place at the second step of the grievance procedure. (Ex.16 Matthews Testimony pp.578-579, Ex. 17)). However, Lymon had no grievance written when he was ordered to see the IME. The Local Union discriminated against Lymon by refusing him fair labor representation when GM sent Lymon to see an IME when Lymon was already terminated in violation of paragraph 43, 43(b)(1) and 43(b)(3) of the UAW/GM National Agreement (Ex. 7, Ex. 18, Ex. 1 p.2). An employee must be currently

employed for GM and the union to send him to see an IME. If the employee is terminated as was the case with Lymon, it becomes moot whether or not he can do a certain job.(Ex.18, para. 43(b)(1)). In this instance, Lymon should have been currently employed by GM for the union and GM to order him to see an IME. (Ex. 18).

7) The Local Union 2209 discriminated against Lymon and subjected him to unfair labor representation when GM terminated Lymon on July 28, 2004 (Ex. 7 p.2 para.3, Ex. 1 p. 2). Then, GM, in collusion with the union ordered already terminated Lymon, to see an IME. (Ex. 17, Ex. 7, Ex. 1). GM sent Lymon another certified letter dated August 2, 2004, informing him that he had been terminated a second time based on the results of the IME.( Ex. 7 p. 2, para.3, Ex. 19, Ex. 17). The Local Union failed to represent Lymon by writing a grievance for Lymon being terminated for the second time and for a different reason. GM Management stated in exhibit 7, p.2 3rd para., "The outcome of the IMO (IME) found the grievant able to perform his previously assigned operation. On August 2, 2004, the grievant was sent a second 64(d) letter advising him that his seniority had been broken and instructing him to return his work badge and keys to the plant." (Ex. 7). The local Union discriminated against Lymon by failing to write a grievance for Lymon because GM Management terminated Lymon for the IME results, in which the IME's opinion was that Lymon could do the Latch Install Job. (Ex. 17, Ex. 18 para. 43(b)(3). GM Management terminated Lymon based on the IME results, but When GM management sent Lymon the second paragraph 64(d) letter informing Lymon that he was terminated based on the IME results, Lymon had not yet seen the IME. There were no IME results. (Ex.19, Ex. 17, Ex. 7 p. 2 para 3). Lymon did not see the IME until August 4, 2004 (Ex. 17). GM Management sent Lymon the termination letter two days before Lymon saw the IME, on August 2, 2004 (Ex.19).GM Management admitted in exhibit 7, Management's Statement of Unadjusted

Grievance that they, in collusion with the union, terminated Lymon based on the results of the IME. "Per the National Agreement, the Union and Management agreed that the outcome of the IMO would determine validity of the effectuated 64(d) release. The outcome of the IMO found the grievant able to perform his previously assigned operation. On August 2, 2004, the grievant was sent a second 64(d) letter advising him that his seniority had been broken and instructing him to return his work badge and keys to the plant." How could GM on August 2, 2004 terminate Lymon based on the IME results and Lymon did not see the IME until August 4, 2004.(Ex.17). The Local Union did not get the IME results until August 17, 2004. The Local Union 2209 Zone Committeeman, Keith Gay, alleges that they called Lymon on August 18, 2004 and informed him of the results of the IME. (Ex. 1, p.2, 2-4 para.). GM Management, in collusion with the union, was intent on terminating Lymon regardless of what the IME results were. The Local Union also failed to represent Lymon when they allowed GM Management to violate paragraph 43(b)(3) of the National Agreement which states that any decision made by the IME is binding on all parties, the union, management and the employee.(Ex. 18). The IME results was that Lymon could do the Latch Install Job.(Ex.17). Instead of GM sending Lymon a letter to return to work based on the IME results, GM instead, terminated Lymon for a second time and the Union refused to represent Lymon.(Ex. 19, 18, 17, 1, 7).

8) Plaintiff, (Lymon) was subjected to unfair labor representation and discrimination because he remained terminated for three months with no grievance written stating why he was terminated. The union refused to communicate with Lymon in any capacity. On October 15, 2004, Lymon filed a formal complaint against the Local Union 2209 officials, Zone Committeeman, Keith Gay, then Committeeman, Dave Matthews and Shop Chairman, Dennis Funk. with the Local Union 2209 Executive Board. (Ex. 20). Lymon charged these union

officials with unfair labor representation and violation of the UAW/GM National Agreement.(Ex.20). On September 29, 2004, Lymon called GM Management in Detriot, Mi. complaining to them about GM Management and the Local Union 2209 misrepresentation. (Ex.21 p.5 para.1). On October 6, 2004, Lymon also sent a letter to GM Management in Detroit. Mi., complaining about the Local Union 2209 and their refusal to communicate with him and represent him by writing a grievance for his termination.(Ex. 21 p.1-6). GM Management in Detroit phoned Lymon back and informed him that the Union was ready to write a grievance for his termination.(Ex. 21p.5 para.1). On October 11, 2004, subsequent to Lymon complaining to GM Management in Detroit, Lymon met with Committeeman, Dave Matthews at the Local 2209, Union Hall where Matthews had Lymon to sign a blank grievance form, grievance form no.(D 35467).(Ex.22). Matthews refused to tell lymon what the grievance was going to be written for, and he refused to give Lymon a copy of the grievance which is procedure. Lymon did not see the grievance again, nor did he know what it was written for until Attorney, Mike Healy of the Indiana Civil Rights Commission filed a Motion for Discovery and the grievance was one of the discovery documents. It was then that Lymon learned that the grievance was written for GM Management violating paragraph 64(d). Management, according to the grievance, charged Lymon with not returning to the plant after receiving the paragraph 64(d) letter instructing him to do so.( Ex. 8, Ex.22). GM Management in exhibit 7, admits that Lymon did not violate paragraph 64(d) (Ex. 7, p.2, para. 3). "The grievant returned to the plant on July 28, 2004 within the allotted five working days." Before Lymon went to the medical department he went to the personnel office where his doctors excuse was accepted. Lymon was terminated on July 28, 2004, and the grievance was written three months after Lymon's termination on

October 11, 2004.(Ex22, Ex. 7, Ex.1). The UAW/GM National Contractual Agreement states that a grievance must be written within 3 days of the termination (Ex. 10, Ex.22).

9) Lymon remained terminated for three years and the Local Union refused to communicate with him, and the grievance that was finally written for his termination sat dormant for three years.(Ex. 22, Ex. 14). Committeeman, Dave Matthews was elected as Shop Chairman of the Local Union 2209 in 2005. (Ex. 23 lines 8-16, Matthews testimony). On June 15, 2007, Shop Chairman, Dave Matthews withdrew the grievance that he had written for Lymon's termination (WWP) withdrawn without prejudice. (Ex. 14, Ex. 22). Exhibit 14 is the union's Third Step Settlement Summary sheet and Matthews's signature is on the bottom of both pages. The Local Union 2209 (Shop Chairman Dave Matthews) discriminated against Lymon based on race when they refused to notify Lymon that his grievance had been withdrawn and that he had appellate rights under the UAW Constitution.(Ex.24). The Local Union 2209's common, best practices was to send union members certified mail informing them of time sensitive information. All Shop Chairmen before Shop Chairman, Dave Matthews took office used certified mail, and all Shop Chairmen after Dave Matthews left office used certified mail to inform union members of time sensitive information. Dennis Funk (Funk) was the Shop Chairman before Matthews was elected, from (2002-2004). Exhibit 20 is a certified letter that Funk sent to Lymon from his Recording Secretary, Carol Schultz (Schultz). Exhibit 34 is a certified letter that Funk sent to Berning from Schultz. (Ex. 20, Ex. 34). Dave Matthews (Matthews) was Shop Chairman from 2005-2007. Matthews claimed that he never used certified mail. However, Burbrink's sworn affidavit contradicts Matthews's allegation. (Ex. 27). Mark Orr (Orr) was Shop Chairman from (2008-2010). Exhibit 28 is a certified letter that Orr sent to Lymon informing him that his grievance had been withdrawn. Exhibit 35 is another certified letter sent to Lymon from Orr's

Recording Secretary, Andy Clark. This Letter also informs Lymon that a new Shop Chairman has been elected, (Rich Letourneau) and there will be a new recording secretary, (Amy Richardson). (Ex. 28, Ex. 35). Rich Letourneau was Shop Chairman from (May 27, 2011-2013). Exhibit 25 and 26 are certified letters sent to Jonathon Burget (Burget) from Letourneau by his Recording Secretary, Amy Richardson (Richardson). Exhibits 29 and 36 are certified letters from Letourneau by Recording Secretary, Richardson sent to Lymon (Ex. 29, Ex. 36). Rich Letourneau was also Shop Chairman from (2016-2018). Exhibit 15 is a certified letter sent to Ami Reveal (Reveal) from Rich Letourneau informing Reveal that her grievance had been collectively bargained with GM Management and that her discharge had been converted to, "A balance of shift plus 30 days disciplinary layoff," and she was to be returned back to work on conditions of employment.(Ex. 15, p.2 para. 1-3). This unlawful and discriminatory action inhibited Lymon from exercising his right to appeal the withdrawl of his grievance in a timely manner in accordance with Article 33 sec.(4)(c) of the UAW Constitution. (Ex.24). Similarly situated, Caucasian male, Jonathon Burget was sent 2 certified letters, September 16, 2011 and October 21, 2011 informing him that his grievance had been withdrawn and that he had a right to appeal under Article 33 of the UAW Constitution. The Shop Chairman at the time was Shop Chairman, Rich LeTourneau. (Ex. 25, Ex. 26, Ex.13 ). Similarly situated, Caucasian Female, Ami Reveal was sent a certified letter informing her that her grievance had been collectively bargained with GM Management, and that she was to be returned back to work after 4 years of being terminated under conditions of employment. The Shop Chairman at the time was Rich LeTourneau. (Letourneau served several terms intermittently) (Ex.15). Similarly situated, Caucasian male, Mark Burbrink who was terminated around the same year as Lymon, in 2004. Burbrink had been terminated for 3 years when on June 15, 2004, the same day that Shop

Chairman, Dave Matthews withdrew Lymon's grievance, Matthews went back to GM Management and collectively bargained with them to return Mark Burbrink back to work on conditions of employment. Shop Chairman at the time was Dave Matthews.(Ex. 14 p.2) Matthews claimed that he never sent certified mail to any union members. However, Mark Burbrink swore and attested to the fact that while Matthews was Shop Chairman, he received a certified letter to return to work on conditions of employment just as Ami Reveal had been sent (Ex. 27, Ex. 15). Lymon was not informed that his grievance was withdrawn, he was not notified of his right to appeal and Lymon's grievance was not collectively bargained with GM to return him back to work under conditions of employment as was similarly situated Caucasians, Burbrink and Reveal.

10) On April 11, 2011, Lymon learned that the union withdrew his grievance and he inquired to the then Local Union 2209, Shop Chairman, Mark Orr (Orr). After Orr could not find any record that indicated that Lymon had been notified. On April 19, 2011 Shop Chairman, Mark Orr sent Lymon a certified letter informing him that the Local Union 2209 had withdrawn his grievance.(Ex. 28). In accordance with the law and the UAW Constitution, Lymon began to seek redress through the union by appealing the withdrawl of his grievance. Lymon appealed to the Local Executive Board, the International Executive Board and the Public Review Board. However, all of the boards denied Lymon's appeal because they claimed that Lymon did not appeal within the time frame as cited in Article 33 sec.(4)(c) of the UAW Constitution.(Ex. 24).There was no way that Lymon could have know that his grievance had been withdrawn after it was held for 3 years, the union did not inform him that it had been withdrawn, and the union refused to communicate with him. (Ex. 14, Ex.21, Ex.20).

11) The Local Union 2209 Executive Board discriminated against Lymon based on race and subjected him to unfair labor representation by denying Lymon's appeal because Lymon did not file his appeal in a timely manner and refusing to hear the merits of the appeal.(Ex.29). Similarly situated, Caucasian female, Linda Berning filed a grievance with the Local Union 2209 on November 20, 2002 grievance no. D 31524. (Ex. 30). Berning's grievance was withdrawn by Local Union Representative, Mark Orr on March 20, 2003. (Ex. 30). Berning, like Lymon was not notified that her grievance had been withdrawn. When Berning learned, 1 year and 4 months later that her grievance had been withdrawn she filed an appeal with the Local Union Executive Board in accordance with Article 33.(Ex.24,Ex.31, Ex.32). Linda Berning was allowed to appeal the withdrawl of her grievance 1 year and 4 months later and the merits of her appeal were heard as opposed to claiming that it was untimely under Article 33 sec.(4)(c) as was done with Lymon's appeal.(Ex.24). Berning met with the Local Executive Board and the Board decided that since they withdrew Berning's grievance and did not notify her in a timely manner that would allow her to appeal within the time limits of Article 33, the Local Union 2209 decided to write Berning another grievance, (Ex.33, grievance no. D 33592) for the same charge to replace the withdrawn grievance no. D 31524. (Ex. 30). The agreement that existed between Berning and the Local Union 2209 was that the union would write Berning another grievance to replace the one that was withdrawn over 1 year and 4 months ago, provided that Berning withdrew her appeal.(Ex. 34 certified letter). The discriminatory disparities between the way that Lymon was treated as opposed to the way that Berning was treated are, 1) Berning was written another grievance 1 year and 4 months after her first grievance was withdrawn because the Local Union 2209 failed to notify Berning that her grievance had been withdrawn. (Ex. 30, Ex. 33) 2) Berning's appeal, unlike Lymon's was withdrawn based on the merits of the appeal as opposed to

the appeal being denied because it was deemed untimely in violation of Article 33. 3) Berning was allowed to appeal the withdrawl of her grievance 1 year and 4 months after it had been withdrawn. Lymon was not allowed to have another grievance written for him because the Local Union failed to notify him that his grievance had been withdrawn. 4) Lymon's grievance was denied as being untimely as opposed to the merits of the appeal. 5) Berning received certified letters informing her of the status of her replacement grievance. (Ex. 34). After Lymon completed the appellate procedure seeking redress through the union process. Lymon dual filed a complaint with the Indiana Civil Rights Commission/ Equal Employment Opportunity Commission on April 13, 2012.(see complaint).

RELIEF:

Plaintiff, Lymon, as a result of the unlawful action taken by the defendant (Local Union 2209) lost his job at GM after 9 years of employment. Lymon and his family suffered substantial emotional distress and extensive financial hardships. Lymon asks the court to make him whole by ordering the defendant to pay Lymon monetary damages of $1.5 million in emotional damages, punitive damages and lost wages. Plaintiff, Lymon asks that the court make him whole by ordering the defendant to go back to GM Management and reopen his grievance, (D 35467) and collectively bargain with GM to get his job back with all available benefits including, back pay, bonuses, profit sharing, overtime, all benefits, seniority and pension and retirement contributions.

(INND Rev. 8/16)

page 3

**RELIEF** – If you win this case, what do you want the court to order the defendant to do?

SEE PAGE 11

**DOCUMENTS** – I have attached a copy of the following documents:

- ◉ Charge Of Discrimination form filed with the Equal Employment Opportunity Commission or the Indiana Civil Rights Commission
- ◉ Notice of Right to Sue letter
- ○ Other: _____

**FILING FEE** – Are you paying the filing fee?

- ◉ Yes, I am paying the $400.00 filing fee. I understand that I am responsible to notify the defendant about this case as required by Federal Rule of Civil Procedure 4. [If you want the clerk to sign and seal a summons, you need to prepare the summons and submit it to the clerk.]
- ○ No, I am filing a Motion to Proceed In Forma Pauperis and asking the court to notify the defendant about this case.

[*Initial Each Statement*]

T.L.L. I will keep a copy of this complaint for my records.

T.L.L. I will promptly notify the court of any change of address.

T.L.L. I declare **under penalty of perjury** that the statements in this complaint are true.

Signature: [signed]   Date: 4-17-20

[*DO NOT* write in the margins or on the back of any pages. Attach additional pages if necessary.]