**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| TERRY L. LYMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.1:20-cv-00169-HAB-SLC |
| v. | ) | |
| | ) | |
| UAW LOCAL No. 2209, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Local 2209 of the United Automobile, Aerospace and Agricultural Implement Workers of America, UAW ("Local 2209" or the "Local Union"), by counsel, pursuant to Fed. R. Civ. P. 56 and N.D. Ind. L.R. 56-1(a)(2) submits the following Brief in Support of its Motion for Summary Judgment and Statement of Material Facts.

**I.     INTRODUCTION**

Nearly 20 years ago, Plaintiff Terry L. Lymon ("Lymon"), who had been on paid sick leave for several months, became embroiled in a dispute with his then-employer General Motors ("GM" or the "Company") over whether he was medically able to perform the Latch-Install job that GM assigned him. The dispute reached an inflection point on July 28, 2004 when Lymon returned to the Fort Wayne Assembly Plant. Lymon contended that the job was inconsistent with his medical restrictions. GM gave him two options- perform the job or be terminated. Lymon did not perform the job, and he contends that he was terminated that day.

On August 2, 2004, GM sent Lymon correspondence advising him that he had broken his seniority pursuant Paragraph 64(d) of the collective bargaining agreement (the "2003-2007 National Agreement") between GM, Defendant Local 2209 and non-party International Union,

1

United Automobile Aerospace Agricultural Implement Workers of America, UAW (the "International Union" or the "UAW").

In response, Local 2209 implemented Paragraph 43(b) of the 2003-2007 National Agreement. Under Paragraph 43(b), Lymon was entitled to an impartial medical opinion as to whether he could perform the Latch-Install job. Consistent with the language in Paragraph 43(b)(3) that provided that the impartial medical opinion was "final and binding on the Union, the employee involved and the Corporation," Local 2209 and GM agreed that, if the Independent Medical Examiner concluded that the Latch-Install job was inconsistent with Lymon's medical restrictions, then Lymon's release would be overturned. Otherwise, Lymon's release would be upheld.

Lymon had the independent medical evaluation in early August 2004. On August 17, 2004, Local 2209 notified Lymon that the Independent Medical Examiner's "final and binding" impartial medical opinion was that the Latch-Install job was within Lymon's medical restrictions.

Lymon wanted Local 2209 to continue to challenge his separation. The Local Union, thus, filed Grievance No. D35467 (the "Grievance") to challenge Lymon's loss of GM seniority under Paragraph 64(d). Through 2007, it processed the Grievance in the grievance procedure and tried to persuade GM to reinstate Lymon. On June 15, 2007, seeing no viable way of either obtaining Lymon's reinstatement through settlement or successfully resolving the Grievance, former Local 2209 Shop Chair Dave Matthews withdrew it.

In April 2012, Lymon dual-filed his race discrimination charge against Local 2209 with the Equal Employment Opportunity Commission (the "EEOC") and the Indiana Civil Rights Commission (the "ICRC"). (Dk. # 1, p. 2-3; Lymon Dep. Ex. 23). Lymon's race discrimination claims against Local 2209 under Title VII of the Civil Rights Act of 1964 ("Title VII") are rooted in his claim that Matthews failed to notify him that he withdrew the Grievance. Lymon contends

that Matthews's failure to properly notify him prevented him from timely challenging the Grievance withdrawal through the UAW Constitution appeals process.

Local 2209 is entitled to summary judgment with respect to Lymon Title' VII race discrimination claims fail for at least three reasons.

First, Lymon is judicially estopped from bringing his claims against Local 2209 because he omitted them from a Chapter 7 bankruptcy lawsuit that he filed in 2014, well after his EEOC charge was filed and while it remained pending. Local 2209 is entitled to summary judgment because Lymon relinquished his Title VII claims against Local 2209 by omitting them from his bankruptcy case. *See*, *e.g.*, *Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006); *Biesek v. Soo Line R.R.*, 440 F.3d 410, 413 (7th Cir. 2006).

Second, all of Lymon's race discrimination claims against Local 2209 except one- his claim that Local 2209 discriminated against him in connection with his 2011 UAW Constitution appeal- relate to the handling, processing and withdrawal of the Grievance and are time-barred.

Lymon had 300 days after the occurrence of the unlawful employment practices that he is alleging to file with the EEOC his discrimination charge against Local 2209. 42 U.S.C. § 2000e-5(e)(1); *Grudowski v. Butler Paper Co.*, 670 F. Supp. 242, 244 (N.D. Ind. 1987).

Yet, Lymon either admits that he knew about the alleged discriminatory acts regarding his Grievance when they occurred between 2004 and 2007, or, alternatively, it is clear that he would have known about them when they occurred had he exercised any measure of reasonable diligence in connection with his Grievance. With regard to the latter point, Lymon not only contends that the Local 2209 never followed up with him about his Grievance after it was filed but also admits that he has no evidence that he followed up with Local 2209 about his Grievance at any point between 2005 and 2011. Lymon abandoned his interest in the Grievance in early 2005 and, in so

doing, gave up any right to challenge through his April 2012 EEOC charge alleged discriminatory acts regarding the Grievance that occurred between four and seven years earlier. Put another way, due to his own inaction, Lymon's claims regarding his Grievance became stale and time-barred years before he filed his EEOC charge.

Moreover, even under the most forgiving application of the statute of limitations, Lymon's claims regarding the Grievance remain time-barred because he admits that he knew no later than April 2011 that Local 2209 had withdrawn his Grievance and was not taking additional action on it, yet he did not file his EEOC charge until more than 300 days later in April 2012.

Finally, Local 2209 is also entitled to summary judgment on the merits of Lymon's Title VII claims because the undisputed evidence establishes that a reasonable jury could not conclude that Local 2209 discriminated against Lymon.

Lymon's sole timely claim, which is that the Local Union discriminated against him in connection with his UAW Constitution appeal, has no merit. The Local Union Shop Committee unanimously concluded that Lymon's appeal was untimely based on the applicable language of the UAW Constitution, which required that Lymon's internal appeal be filed with Local 2209 within 60 days from the date that he became aware or reasonably should have become aware of the withdrawal. Since Lymon was appealing in 2011 a Local Union action that occurred on June 15, 2007, that decision was not both reasonable and non-discriminatory.

Lymon identifies a single Caucasian Local Union member- Linda Berning- that he contends was treated more favorably by the Local Union than him with regard to a UAW Constitution appeal. Yet, Lymon and Berning are not similarly situated. And, even if they were, Local 2209 has legitimate, non-discriminatory reasons that explain why their appeals were treated differently. For one, the Shop Committees that decided the appeals were composed of different

4

decisionmakers. Also, neither the UAW Constitution nor any governing document obligates the current Local 2209 Shop Committee to consider decisions of past Shop Committees when evaluating internal UAW Constitution appeals that are before it.

The undisputed facts further establish that the evidence as a whole does not support a finding that Local 2209 discriminated against Lymon. To the contrary, Local 2209 mounted not one but two separate challenges to his termination. It processed the Grievance that Lymon contends should not have been withdrawn in 2007 for three years and attempted to persuade GM to reinstate him. It only withdrew the Grievance after it became abundantly clear that GM would not reinstate Lymon and that his grievance would likely not succeed at arbitration.

Finally, Lymon ultimately suffered no harm. He was able to appeal the withdrawal of the Grievance through all of the steps of the UAW Constitution appeals procedure. And, in December of 2012, the Public Review Board, an independent body that does not include UAW or Local 2209 officers, concluded that his appeal had no substantive merit because it was proper for Local 2209 to withdraw his Grievance in 2007. Lymon's race claims fail on their merits because he received everything and more that he was entitled to receive in connection with his separation.

## II.    ARGUMENT

### A.    Standard Of Review

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v.*

*Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court has one task: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id*.

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists cannot create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party and view all reasonable inferences in that party's favor. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000).

The law does not exempt a *pro se* party facing summary judgment from demonstrating a material dispute of fact, and furthermore, the law does not require a district court judge to scour the record in search of a dispute of fact on behalf of a pro se party. *Ledford v. Hahn*, 2019 U.S. Dist. LEXIS 130998, *3, 2019 WL 3574570 (N.D. Ind. 2019).

**B.    Lymon's Claims Against Local 2209 Are Barred By The Doctrine Of Judicial Estoppel**

On July 10, 2014, Lymon filed a Chapter 7 bankruptcy petition with the United States Bankruptcy Court for the Northern District of Indiana in Case No. 14-11740-reg. (Lymon Tr. 12-13; Dk. # 1, Case No. 14-11740-reg[1]). Lymon did not include or identify his pending legal claims against Local 2209 in his Chapter 7 bankruptcy petition or his amended schedule of assets. (Dk. # 1, Case No. 14-11740-reg, p. 20; Dk. # 16, Case No. 14-11740-reg, p. 2-3). On October 14, 2014, Judge Robert Grant issued an Order discharging Lymon under Section 727 of title 11, United States Code, (the Bankruptcy Code). (Dk. # 19, Case No. 14-11740-reg, p. 1). On June 21, 2016, Lymon's bankruptcy lawsuit was closed. (Dk. for Case No. 14-11740-reg).

---

[1] Relevant pleadings from Lymon's bankruptcy lawsuit are attached as Attachment K to the Designation of Evidence Appendix being filed contemporaneously herewith.

The judicial estoppel doctrine prevents litigants from manipulating the judicial system by prevailing in different cases or case phases by adopting inconsistent positions. *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 547 (7th Cir. 2014). It applies when litigants omit legal claims from bankruptcy filings. *See, e.g.*, *Cannon-Stokes v. Potter*, 453 F.3d at 448; *Biesek v. Soo Line R.R.*, 440 F.3d 410.

For example, in *Cannon-Stokes v. Potter*, Traci Cannon-Stokes filed a Chapter 7 bankruptcy petition while her claim against the Postal Service was pending. 453 F.3d at 447. She asserted that she had no assets in her Chapter 7 bankruptcy petition, expressly denying that she had any valuable legal claims. *Id*. On appeal, the Seventh Circuit found that such claims could have been identified in her schedule of assets as "contingent and unliquidated claims of every nature," which it noted, "left no room for quibbles." *Id*. Based on Cannon-Stokes's representation, the bankruptcy court discharged her of approximately $98,000 in unsecured debts. *Id*.

The Postal Service contended that judicial estoppel applied because: Cannon-Stokes had represented that she had no claim against the Postal Service (or anyone else); that representation had prevailed; she had obtained a valuable benefit in the discharge of her debts; and she wanted to assert the opposite in order to "win" for the second time. *Id*.

Cannon-Stokes blamed the omission on her bankruptcy lawyer. *Id*. at 448. The district court accepted that explanation and rejected the judicial estoppel argument. *Id*. On appeal, the Postal Service again argued that judicial estoppel barred Cannon-Stokes's claim. *Id*.

The Seventh Circuit found that "such a sizeable claim," which amounted to three times the value of her debts, could not have been overlooked in the bankruptcy schedules. *Id*. It further found that, "[I]f Cannon-Stokes were really making an honest attempt to pay her debts, then as soon as she realized that it *had* been omitted, she would have filed amended schedules and moved

to reopen the bankruptcy, so that the creditors could benefit from any recovery." *Id*. Yet, she "never did that" and "wanted every penny of the judgment for herself." *Id*.

The Seventh Circuit also rejected Cannon-Stokes's argument that her omission was her bankruptcy lawyer's fault. *Id*. at 448-49. Noting that "the signature on the bankruptcy schedule is hers," the Court found: "The representation she made is false; she obtained the benefit of a discharge; she has never tried to make the creditors whole; now she wants to contradict herself in order to win a second case." *Id*. at 449. It therefore concluded, "Judicial estoppel blocks any attempt to realize on this claim for her personal benefit." *Id*.

Lymon also did not divulge his Title VII claims against Local 2209 in either his Chapter 7 bankruptcy petition or his amended schedule of assets. (Dk. # 1, Case No. 14-11740-reg, p. 20; Dk. # 16, Case No. 14-11740-reg, p. 2-3). He failed to do so even though the Schedule of Assets allowed him to identify, "Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims." (Dk. # 1, Case No. 14-11740-reg, p. 20; Dk. # 16, Case No. 14-11740-reg, p. 3). He was discharged of $545,924.44 in debt. (Dk. # 1, Case No. 14-11740-reg, p. 16; Dk. # 19, Case No. 14-11740-reg, p. 1). He is nevertheless seeking 1.5 million dollars in damages from Local 2209 in this lawsuit, which, as in *Cannon-Stokes v. Potter*, is about three times the amount of his discharged debts. (Dk. # 1, p. 1).

By choosing not to identify any legal claims in his bankruptcy proceedings, Lymon represented to the court that he did not have any valuable legal claims, including claims of race discrimination against Local 2209. He did so even though he knew about those race discrimination claims and had already raised them in his April 2012 EEOC charge against Local 2209. (Dk. # 1, p. 2-3; Lymon Dep. Ex. 23). Having received the benefit of failing to disclose these claims in his

bankruptcy action, the judicial estoppel doctrine bars Lymon from now taking the position that these claims are viable, pending and recoverable against Local 2209.

### C. Other Than Lymon's Claim That Local 2209 Discriminated Against Him By Denying His UAW Constitution Appeal In July 2011, His Claims Against Local 2209 Are Time-Barred

Under Title VII, an employee has 300 days from the occurrence of an alleged discriminatory or retaliatory act to file a timely charge with the EEOC or the relevant state agency, here the ICRC. 42 U.S.C. § 2000e-5(e)(1); *Grudowski*, 670 F. Supp. at 244.  *See also*, *Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004)

The 300-day limitations period starts to run with each discriminatory act, not the point at which the consequences become apparent. *Finnane v. Pentel of America, Ltd.* 43 F.Supp.2d 891, 895 (N.D. Ill. 1999). To the extent a plaintiff attempts to bring claims that fall outside the 300-day period, such claims must be dismissed. *See Stepney*, 392 F.3d at 241; *Finnane*, 43 F.Supp.2d at 898 (dismissing Title VII allegations that occurred outside the 300-day window).

A "discrete" discriminatory act "occurred" on the day that it "happened" and a party, therefore, must file a charge with the EEOC within 300 days of the date of the act "or lose the ability to recover for it." *Amtrak v. Morgan*, 536 U.S. 101, 110 (2002). Each discrete discriminatory act "starts a new clock for filing charges," and the clock starts on the date that the act "occurred."  *Id*. at 113. If the employee knew, or with the exercise of reasonable diligence should have known, that each act, once completed, was discriminatory, the employee must sue upon that act within the relevant statutory period. *Jones v. Merchants Nat'l Bank & Trust Co*., 42 F.3d 1054, 1058 (7th Cir. 1994).

Lymon's EEOC charge is signed April 13, 2012. (Dk. # 1, p. 2-3; Lymon Dep. Ex. 23). To be timely, the allegations in the EEOC charge must have occurred on or after June 18, 2011. As

explained below, all of Lymon's race discrimination claims are time-barred, except his claim that the Local Union discriminated against him in connection with UAW Constitution appeal.

### 1.    The Alleged Discriminatory Acts That Occurred In Or Around 2004

Lymon raises several discrimination allegations that relate to his 2004 separation from GM. For example, Lymon alleges that the Local Union colluded with GM in connection with Lymon's separation. Dk. # 1, p. 5-6. Lymon also contends that, on July 28, 2004, he requested that former Local Union officer Dave Matthews write a grievance challenging Lymon's termination that Matthews refused to write. (Lymon Tr. 65-69). Lymon further contends that a grievance should have been written by Local 2209 within three days of his separation. (Lymon Tr. 60-61).

It is undisputed that Lymon knew about these alleged discriminatory acts at or around the time of his separation in August 2004. In this regard, it is undisputed that Lymon contends that he was terminated by GM on July 28, 2004. (Lymon Tr. 60-61). Lymon testified that he knew on July 28, 2004 that Matthews was not going to write the grievance that Lymon had requested that day. (Tr. 66, 68-69). Lymon also testified that he knew, prior to the August 4, 2004 examination, that Gay was not going to accommodate Lymon's request for a different medical examiner. (Lymon Tr. 89-90, 101, 281; Lymon Dep. Ex. 6). These allegations are all time-barred because Lymon knew about them in August 2004, but did not file his EEOC charge until several years later in April 2012. *Stepney,* 392 F.3d at 240-241 (7th Cir. 2004) (employee's loss of seniority was a discrete act and his Title VII claim was time-barred because EEOC charge was not filed within 300 days of the date that plaintiff knew he lost his seniority).

Lymon also contends that he attempted unsuccessfully through October 2004 to get Matthews, Gay and then-Local Shop Chair Dennis Funk to provide him additional assistance in connection with his separation from GM. (Lymon Tr. 99-101, 122, 282). However, it is undisputed

that Matthews met with Lymon on October 11, 2004 and Lymon signed the Grievance that was filed that day. (Lymon Tr. 103-104; Matthews Decl. ¶ 36). Lymon, thus, knew about these alleged discriminatory acts that he contends occurred between August 2004 and October 2004, but, again, did not file his EEOC charge until almost eight years later in April 2012.

Lymon contends that Local 2209 stopped communicating with him about the Grievance after it was filed on October 11, 2004. (Lymon Tr. 147). Lymon testified that he tried to follow up on it for about three months by leaving telephone messages with the Local Union. (*Id*. at 115). Lymon contends that his calls were not returned. (*Id*.). Lymon admitted that he does not have any evidence that he tried to contact the Local Union about the grievance between 2005 and April of 2011. (*Id*. at p. 116-17). Lymon's allegations that the Local Union discriminated against him by not communicating with him in connection with the Grievance, thus, accrued sometime early in 2005 when he knew that Local 2209 was not following up with him about the Grievance. Since he did not file his EEOC charge until April 2012, these allegations are also untimely.

### 2. The Alleged Discriminatory Acts That Occurred In 2007

It is undisputed that, on June 15, 2007, then-Local 2209 Shop Chair Matthews withdrew Lymon's Grievance. (Matthews Decl. ¶ 56, Ex. 6). That same day, GM agreed to reinstate employee Mark Burbrink, who is Caucasian. (Matthews Decl. ¶¶ 64-65, Ex. 5, p. 2).

Lymon testified that he has no personal knowledge of what the Local Union did to process the Grievance after it was filed. (Lymon Tr. 155, 243). Even assuming *arguendo* that Lymon was discriminated against in connection with the processing of the Grievance, it necessarily follows that this alleged discrimination took place no later than June 15, 2007 because the Grievance was withdrawn that day. Any claims of discriminatory conduct by Local 2209 in connection with the processing of the Grievance are time-barred because they occurred on or before June 15, 2007 and

11

Lymon would have known of these alleged discriminatory acts if he had exercised reasonable diligence in connection with his Grievance. *Jones*, 42 F.3d at 1058. This is particularly true because Lymon admits that he did not follow up with Local 2209 about the Grievance between 2005 and 2011. (Lymon Tr. 115-117).

Lymon also alleges that Matthews: 1) should not have withdrawn the Grievance; 2) should have provided Lymon written notice of the Grievance withdrawal and of Lymon's right to challenge the appeal through the UAW Constitution appeal procedure; and 3) discriminated against Lymon because Burbrink was reinstated on the same day that Lymon's Grievance was withdrawn.

These alleged discriminatory acts are all "discrete" acts of discrimination that "occurred" when they "happened." *Morgan*, 536 U.S. at 110. Each of these alleged discriminatory acts occurred and happened on or around June 15, 2007. Lymon tacitly conceded this point when he acknowledged that his allegations against Matthews, including, but not limited to his allegation that Matthews failed to notify him of the withdrawal of his Grievance and of his appeal rights, all occurred between 2004 and 2007. (Lymon Tr. 279-281). Lymon's "clock" for filing charges regarding these allegations, thus, started on or around June 15, 2007. *Morgan*, 536 U.S. at 113. The 300-day period for him to file discrimination charges regarding these allegations expired well before he filed his April 2012 EEOC charge. *Id*. at 113.

This is true even accepting, as the Court is required to do at this juncture, Lymon's claim that he was never notified by Matthews of the Grievance withdrawal. Claimants like Lymon cannot avoid the 300-day limitations period merely because they contend that they did not have actual notice of the alleged discriminatory action(s). The appropriate measure is, instead, whether they should have known that the act in question was discriminatory with the exercise of reasonable diligence. *Jones*, 42 F.3d at 1058.

Again, Lymon admits that he did not inquire about his Grievance with Local 2209 between 2005 and April 2011. (Lymon Tr. 115-117). Thus, almost four years passed between the occurrence of the alleged discriminatory acts that relate to Matthews's 2007 withdrawal of the Grievance and the time that Lymon decided to follow up on his Grievance. And, almost five years passed from the occurrence of these alleged discriminatory acts and the filing of Lymon's EEOC charge. That is not reasonable diligence. As such, these claims are time-barred.

### 3. Because Lymon Admits That He Knew No Later Than April 2012 That No Additional Action Would Be Taken On His Grievance, All Allegations Related To His Grievance Are Time-Barred

Lymon admits that he knew that the Grievance had been withdrawn no later than April 2011 based on his communications with then-Local 2209 Shop Chair Orr. (Lymon Tr. 130-131; Lymon Dep. Ex. 8). Lymon further concedes that he knew that the Local Union was not going to take additional action on the Grievance at that time. (Lymon Tr. 130-131, 151).

It is, thus, undisputed that: 1) Lymon knew no later than April 2011 that his Grievance had been withdrawn; 2) he had not received the notice that he contends he should have received in connection with the withdrawal of the Grievance; 3) and Local 2209 was not taking further action on his Grievance. His claims regarding the Grievance therefore accrued prior to June 18, 2011 and more than 300 days before the April 2012 EEOC charge was filed. There are, thus, time-barred even under the most forgiving application of the statute of limitations.

### 4. Equitable Tolling Does Not Save Lymon's Claims

"In limited circumstances, the doctrine of equitable tolling can extend a limitations period where, despite due diligence, a plaintiff cannot obtain the information necessary to learn that he may have a claim." *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 698 (7th Cir. 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).

The Supreme Court has cautioned that equitable tolling in the context of Title VII is "to be applied sparingly." *Nat'l R.R.*, 536 U.S. at 113. The doctrine may extend the statute of limitations if, ***despite all due diligence***, a plaintiff cannot obtain the information necessary to realize that he may possibly have a claim. *Chakonas v. City of Chicago*, 42 F.3d 1132, 1135 (7th Cir. 1994) (emphasis added). Equitable tolling requires a court to consider whether a reasonable person in the plaintiff's position would have been aware of the *possibility* that he had suffered an adverse employment action because of illegal discrimination. *Id.* (emphasis in original).

In the Seventh Circuit, a plaintiff awakens to the possibility of a Title VII claim far sooner than he achieves any level of certainty that his rights have been violated: "The qualification 'possible' is important. If a plaintiff were entitled to have all the time he needed to be *certain* his rights had been violated, the statute of limitations would never run--for even after judgment, there is no certainty." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990).

Moreover, the doctrine of equitable estoppel, when invoked as a defense to the statute of limitations, requires the plaintiff to show that the defendant took steps **<u>deliberately</u>** to prevent the plaintiff from bringing a timely suit, **<u>whether by concealing the existence of the plaintiff's claim or by promising not to plead the statute of limitations</u>**. *Beckel v. Wal-Mart Assocs.*, 301 F.3d 621, 622 (7th Cir. 2002) (emphasis added).

On appeal here, the Seventh Circuit Court of Appeals concluded that, for purposes of the pleadings, this Court wrongly ruled that Lymon's Title VII claims that the Local Union discriminated against him in connection with his Grievance were time-barred. (Court of Appeals Case No. 20-3022, Dk. # 18). Taking Lymon's factual allegations as true, as was required in connection with Lymon' appeal of the Local Union's Motion to Dismiss, the Seventh Circuit found, "If Lymon can prove his allegation that, through no fault of his own, the Local Union

14

intentionally kept him in the dark about its handling of the grievance for seven years, equitable tolling can save his race discrimination claims." *Id*. at 2. In so doing, it noted that Lymon alleged in his Complaint that "through no fault of his own and despite vigorous efforts to keep tabs on his grievance, he did not and could not know (because of the union's stonewalling) until April 2011 that the Local Union had sat on and then withdrawn his grievance." *Id*. at p. 4. It further observed that "fact development may reveal that [Lymon's] inquiries were insufficient." *Id*.

Now that the evidentiary record has been developed in this matter, it is patently clear that the doctrine of equitable tolling doctrine does not save Lymon's time-barred claims.

For one, Lymon has not alleged and there is no supporting evidence to support a finding that Local 2209 promised Lymon that it would not plead statute of limitations as a defense.

The record evidence also establishes that: 1) the Local Union did not deliberately conceal the existence of Lymon's legal claims; and 2) Lymon did not exercise even nearly the requisite level of diligence to obtain the information necessary to realize that he may have had legal claims against Local 2209.

Lymon has now admitted that he did not try, vigorously or otherwise, to follow up on his Grievance for six years between 2005 and April 2011. (Lymon Tr. 115-117). Lymon also contends that no Local Union officer communicated with him regarding his Grievance after it was filed on October 11, 2004. (*Id*. at 147).

Lymon has not been able to establish that Matthew sent the notification that he contends he should have received to any other employee. (Matthews Decl. ¶ 62).

It is also undisputed that no Union officer including, but not limited to, Matthews, deliberately misled Lymon so that he would not sue the Local Union for race discrimination. Indeed, Matthews stopped serving as a Local Union officer in 2008. (Matthews Decl. ¶ 15). There

is no evidence that any other Local Union officer worked with Matthews to deliberately conceal Matthews's withdrawal of the Grievance or any potential legal claim that Lymon had against Local 2209. To the contrary, when Lymon inquired about his Grievance for the first time in six years, former Local 2209 Shop Chair Orr advised him orally and in writing that the Grievance had been withdrawn in 2007. (Lymon Tr. 130-131, 151).

The benefit of the doubt that the Seventh Circuit gave is not warranted now. Simply put, it is clear that the Local Union did not conceal Lymon's potential claims through no fault of Lymon's. To the contrary, Lymon abandoned the Grievance between 2005 and April 2011, and no Local Union officer made any representation whatsoever to him about the Grievance during that period. Equitable tolling is, thus, neither applicable nor appropriate here.

Finally, even assuming *arguendo* that equitable estoppel were appropriate here, it still would not save Lymon's time-barred claims. The Seventh Circuit has made it clear that plaintiffs do not receive "a fresh 300 days to file his [EEOC] charge once he obtains enough information to suspect discrimination. It, instead, requires that the plaintiff file with the EEOC "within a reasonable time." *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 268 (7th Cir. 1995). According to the Seventh Circuit, a reasonable time to file an administrative complaint is "days, and at most weeks." *Id.*; *Palmer v. Ind. Univ.*, 31 F.4th, 583, 588 (7th Cir. 2022) (holding same). Thus, even if equitable tolling applied in this case, Lymon's time-barred claims would not be saved because: 1) he knew about them in April 2011; 2) and he did not file his claims within a reasonable period of days or weeks, but, instead, filed them almost one year later.

### D.    The Undisputed Record Evidence Does Not Support A Finding That Local 2209 Discriminated Against Lymon

Under the framework set forth by the Seventh Circuit in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), a Title VII claim survives summary judgment if the plaintiff presents

evidence that, "considered as a whole," would allow a reasonable jury to find that his protected characteristic caused the adverse action in question.

To meet that burden, the plaintiff may rely on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Id*. at 765-66.

To establish his *prima facie* case under *McDonnell Douglas*, Lymon must show, among other things, that "he is a member of a protected class" and that "one or more similarly situated individuals outside his protected class received better treatment" from Local 2209. *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017) (internal quotation marks omitted); *see also Garity v. APWU Nat'l Labor Org.*, 828 F.3d 848, 859 (9th Cir. 2016) ("[A] union member can make out a prima facie claim of discrimination by introducing evidence that the member was singled out and treated less favorably than others similarly situated on account of race ...."); .*Green v. AFT/IFT Local 604*, 740 F.3d 1104, 1107 (7th Cir. 2014) (If a union "would have processed [a] grievance or represented [a member]" differently if he were not a member of a protected class, "then the union violated Title VII.").

A court therefore must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question of whether, considering the evidence as a whole, "a reasonable factfinder [could] conclude that ... [a] proscribed factor caused ... the adverse employment action." *Ortiz*, 834 F.3d at 765.

### 1.    There Is No Direct Evidence Of Race Discrimination By Local 2209

Direct evidence encompasses discriminatory statements by a decision-maker that are claimed to relate to the contested decision or adverse action. *See, e.g., Troupe v. May Dep't Stores Co*., 20 F.3d 734, 736 (7th Cir. 1994) (stating, in a Title VII case, that direct evidence "can be

interpreted as an acknowledgment of discriminatory intent by the defendant or its agents"). There is no direct evidence that Local 2209 discriminated against Lymon,

### 2.    Lymon Cannot Meet His Burden Under *McDonnell Douglas*

Lymon cannot prove under the *McDonnell Douglas* burden-shifting framework that this race discrimination claim should survive summary judgment.

### a.    The Denial Of Lymon's UAW Constitution Appeal

Lymon has identified one individual – Linda Berning- who he contends was treated more favorably than him by Local 2209 in connection with the UAW Constitution appeal process.

On November 20, 2002, a grievance alleging that GM violated Paragraph 6(a) of the 2003-2007 National Agreement, which prohibited discrimination, including disability discrimination, was filed on Berning's behalf (the "First Berning Discrimination Grievance."). (LeTourneau Decl. ¶¶ 40-41, Ex. 3, p. 12). On March 20, 2003, former Local 2209 Zone Committeeperson Orr withdrew the First Berning Discrimination Grievance because he could not recall why Berning had claimed that she had been discriminated against. (LeTourneau Decl. ¶¶ 42-43, Ex. 4).

On July 2, 2004, Berning filed an internal UAW Constitution appeal that challenged the March 20, 2003 withdrawal of the First Berning Discrimination Grievance. In her appeal, Berning claimed that she had not been notified that the grievance had been withdrawn until June 2004. (LeTourneau Decl. ¶ 44, Ex. 5; Dk. # 1-1, p. 56-57).

The Local 2209 Shop Committee that was in office at the time of Berning's appeal met with Berning to consider her appeal on August 17, 2004.  Berning was informed that her grievance would be reinstated if she could show them that GM's belief that she suffered from depression could constitute disability discrimination. Berning later submitted a summary of law outlining the "regarded as" disability discrimination violation. (LeTourneau Decl. ¶ 45).

To resolve Berning's appeal, the Local Shop Committee in office 2004 agreed that it was appropriate for a replacement Paragraph 6(a) discrimination grievance (the "Second Berning Discrimination Grievance") to be filed on September 30, 2004. That determination was reached because: 1) Orr withdrew the First Berning Discrimination Grievance because he could not remember what the alleged discrimination was; 2) Berning subsequently presented evidence to establish that she could be "regarded as" having a disability and, thus, be the victim of disability discrimination; and 3) Berning remained employed and continued to claim that she was being discriminated against by GM. (LeTourneau Decl. ¶ 46, Ex. 6).

A similarly situated employee must be directly comparable in all material respects. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018).

One hallmark of determining whether employees are similarly situated is determining whether there was a common decisionmaker among them. *See, Coleman v. Donahoe*, 667 F.3d 835, 847-48 (7th Cir. 2012). Under Title VII, a "decisionmaker is the person 'responsible for the contested decision.'" *Schandelmeier-Bartels v. Chicago Park Dist*., 634 F.3d 372, 379 (7th Cir. 2011), quoting *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003).

Lymon and Berning are not similarly situated, in part, because different decisionmakers decided their appeals. Berning's appeal was decided in 2004 by the Local 2209 Shop Committee that was in office at that time. (LeTourneau Decl. ¶ 46). In contrast, Lymon's appeal was decided in 2011 by the different Local 2209 Shop Committee in office at that time. (LeTourneau Decl. ¶ 52). Shop Chair LeTourneau was not a member of the Shop Committee that decided Berning's appeal in 2004, and the Shop Committee that decided Berning's appeal had different members than the Shop Committee that decided Lymon's appeal. (LeTourneau Decl. ¶ 52).

Also, a replacement grievance was filed for Berning because she contended that she was still experiencing disability discrimination, she was able to demonstrate that how GM's actions could constitute disability discrimination and the Local Officer who withdrew her Grievance could not remember why he withdrew the Grievance. (LeTourneau Decl. ¶ 46, Ex. 6).

In contrast, Lymon received two challenges to his separation. Local 2209 first challenged his separation through the Paragraph 43(b) process. After it was determined that the Latch-Install job was within Lymon's medical restrictions, it filed the Grievance. It did so even though the Independent Medical Examiner's impartial medical opinion was "final and binding." It processed the Grievance for three years, attempting to obtain Lymon's reinstatement. It withdrew the Grievance when it became clear that those efforts would not work and that the Grievance would likely not succeed at arbitration. When Lymon filed his appeal in 2011, after at least 6 years of not contacting the Local Union, unlike Berning, he was, thus, a former employee who had received the process (and then some) that he was due in connection with his separation from GM.

Even assuming *arguendo* that Lymon could establish a *prima facie* case regarding his UAW Constitution appeal claim, Local 2209 has a legitimate, non-discriminatory reason for its 2011 denial of Lymon's appeal. The Local 2209 Shop Committee in office in 2011 denied Lymon's appeal because it concluded that the appeal was untimely under the applicable language of the UAW Constitution. In so doing, it found that Lymon reasonably should have become aware of Matthews's 2007 decision to withdraw Lymon's grievance more than 60 days before he initiated his May 16, 2011 internal appeal of that decision with the Local Union. (LeTourneau Decl. ¶ 35; Richardson Decl. ¶ 49). In light of the plain language of the appeal time limits language of the UAW Constitution, this decision was clearly reasonable. LeTourneau Decl. ¶ 28, Ex. 1, Art. 33, §3(a), 4(b) and 4(c), p.89-90, 94). This is particularly true since neither the UAW Constitution nor

20

any governing document obligates the current Local 2209 Shop Committee to consider decisions of past Shop Committees when evaluating internal UAW Constitution appeals that are before it, and neither Lymon nor any other person who attended the 2011 Shop Committee meeting on Lymon's appeal raised the Berning appeal. (LeTourneau Decl. ¶¶ 52-53).

### b.    The Alleged Failure To Notify Lymon About The Grievance Withdrawal And His Appeal Rights

Lymon contends that Local 2209 discriminated against him because he claims that Caucasian employees Ami Reveal, Mark Burbrink and Jonathan Burget were provided notification of their grievance resolutions and/or UAW Constitution appeal rights and he was not.

Burget and Lymon are not similarly situated. They worked for different employers- GM and Caravan Knight- and had rights under different collective bargaining agreements. (Klepper Decl. ¶¶ 10-17). Moreover, the notice that Burget received regarding the withdrawal of his grievance and his UAW Constitution appeal rights came from International Union Servicing Representative Mike Klepper and not a Local Union officer. (Klepper Decl. ¶ 32, Ex. 3). Additionally, Local 2209 communicated with Lymon in connection with his appeal in the same way that it communicated with Burget in connection with his appeal- in writing by certified mail. (Richardson Decl. ¶¶ 39, 50, 67, Exs. 4, 6, 9).

Burbrink testified under oath that he did not receive a certified letter from the Local Union in connection with his termination from GM, his reinstatement or the Conditions of Employment that allowed him to return to GM. (Burbrink Tr. 16, 33).

Reveal and Lymon are also not similarly situated with respect to the notice issue. In this regard, Lymon acknowledges that Matthews did not send Reveal the correspondence that he contends that he should have received from Matthews. (Tr. 278).

Additionally, Local 2209 has a legitimate, non-discriminatory reason for Lymon's failure to receive written notice of the withdrawal of his Grievance and his UAW Constitution appeal rights by certified mail. Local Union officers are not required to provide this notice. (Matthews Decl. ¶ 61; LeTourneau ¶ 65). It is undisputed that Matthews did not provide such notice to any UAW members when he was a Local Union officer.  (Matthews Decl. ¶¶ 62, 69).

### c.    Lymon's Reinstatement

Lymon contends that the Local Union discriminated against him because Caucasian employees Ami Reveal and Mark Burbrink were reinstated and he was not.

Reveal and Lymon are not similarly situated. Reveal was initially terminated under a different contract than Lymon. (LeTourneau Decl. ¶ 57). Reveal's first termination did not implicate Paragraph 43(b) or Paragraph 64(d). (LeTourneau Decl. ¶¶ 54-55). Reveal's termination was not handled by the same Local Union officers who handled Lymon's Grievance.  (LeTourneau Decl. ¶¶ 58-59, Exs. 7-8). LeTourneau, who had no role in the processing or withdrawal of Lymon's Grievance, procured Reveal's first reinstatement. (LeTourneau Decl. ¶ 59, Ex. 8).

Burbrink is also not similarly situated to Lymon. Burbrink's termination did not involve a dispute between him and GM over whether he was medically able to perform a job that GM assigned him. It also did not involve Paragraph 43(b) or Paragraph 64(d) of the 2003-2007 National Agreement. Burbrink was, instead, terminated for violating GM's attendance policy. (Burbrink Tr. 14-15; Matthews Decl. ¶ 66; Lymon Tr. 232-233).

Even if Lymon could make out a *prima facie* case with respect to Reveal or Burbrink, Local 2209 has a legitimate, non-discriminatory reason for the decisions that were made in the cases of Lymon, Reveal and Burbrink. GM was willing to reinstate Reveal and Burbrink because there were extenuating circumstances that excused their attendance problems. In Reveal's case there

was evidence that her car had been stolen and that caused her attendance problems. (LeTourneau Decl. ¶ 56, Ex. 7). Burbrink was reinstated after he demonstrated a commitment to his recovery from the substance abuse issues that led to his termination. (Matthews Decl. ¶ 67; Burbrink Tr. 26, 32-33). In contrast, GM was not willing to reinstate Lymon because of the "final and binding" nature of his independent medical examination, and, based on that language, Matthews did not believe the Grievance could be successfully arbitrated. (Matthews Decl. ¶¶ 57-58).

### d.    The Filing Date Of Lymon's Grievance

Lymon claims that Burget's grievance was filed closer in time to his termination from Caravan Knight than Lymon's Grievance was filed in connection with his separation from GM. (Lymon Tr. 213, 220). Yet, as explained above, Burget and Lymon are not similarly situated. This undisputed fact alone precludes Lymon from establishing a *prima facie* case on this issue.

Additionally, Lymon ignores that the Paragraph 43(b) independent medical examination that he received was an expedited procedure within the grievance procedure to resolve the dispute between Lymon and GM over Lymon's medical restrictions as quickly as possible. (Matthews Decl. ¶ 26, Ex. 1, p. 33-35). Lymon had his independent medical examination within two days of the date that GM contended in writing that he had broken his seniority. (Lymon Dep. Exs. 5-6; Lymon Admission Nos. 5-6). Thus, contrary to his assertion, a grievance challenging Lymon's separation was processed almost immediately after Lymon's separation.

Lymon also did not suffer an adverse action based on the timing of his grievances. GM never claimed that the Grievance was procedurally defective or untimely for any reason, including, but not limited to, its filing date. (Matthews Decl. ¶ 48). GM, instead, contended that the Grievance had no substantive merit because the independent medical examination was "final and binding"

under Paragraph 43(b). (*Id.*). Because Lymon's Grievance was not denied on timelines grounds, he did not suffer an adverse employment action.

Finally, the Local Union has a legitimate, non-discriminatory reason that justifies its action. As explained above, the implementation of the Paragraph 43(b) procedure was not only appropriate but also allowed for an expedited resolution of Lymon's dispute with GM and resolution of that dispute on a "final and binding" basis. (Matthews Decl. ¶ 27, Ex. 1, p. 33-35). The fact that the Local Union also attempted to obtain Lymon's job back through the Grievance only underscores that it did not discriminate against Lymon.

### 3.    A Reasonable Jury Could Not Conclude On The Evidence As A Whole That Local 2209 Discriminated Against Lymon

Reviewing the undisputed evidence as a whole also does not lead to the conclusion that a reasonable jury could find that Local 2209 discriminated against him.

To the contrary, the undisputed facts demonstrate that the Local Union harbored no racial animus toward Lymon. It first challenged Lymon's separation through the applicable Paragraph 43(b) expedited grievance procedure. Unfortunately for Lymon, the impartial medical opinion that he received did not support his position on the Latch-Install job. Since the contract provided that the impartial medical opinion was "final and binding" and since Lymon relinquished his seniority pursuant to Paragraph 64(d) by not working the Latch-Install job as instructed without a satisfactory reason, Local 2209 arguably did not even have the right under the grievance procedure to challenge Lymon's loss of seniority through the Grievance. (Matthews Decl. ¶ 40, Ex. 1, p. 35).

Local 2209 nevertheless filed the Grievance, and, thus, gave Lymon an additional shot at reinstatement. Between 2004 and 2007, Local 2209 processed the Grievance through the steps of the grievance procedure and tried to successfully resolve it. (Matthews Decl. ¶ 42). Matthews met with GM Labor Relations Representatives to lobby for Lymon's reinstatement. (Matthews Decl. ¶

47). Matthews only withdrew the Grievance after it became clear that GM would not reinstate Lymon and he determined that the Grievance was not likely to be successfully arbitrated. (Matthews Decl. ¶ 58, Ex. 1, p. 35).

Lymon contends that he was not timely notified of the Grievance withdrawal. Yet, Lymon also admits that he did not follow up on the Grievance for six years. When he did follow up on it in 2011, he was promptly advised that his Grievance had been withdrawn.

As explained above, in 2011, Local 2209 made a reasonable determination that, given Lymon's apparent abandonment of the Grievance, his appeal was untimely under the plain language of the UAW Constitution appeals procedure. Additionally, it is undisputed that the Local Union has denied several appeals from Caucasian appellants, including Reveal. (LeTourneau Decl. ¶¶ 62-63, Ex. 9; Richardson Decl. ¶ 65).

Finally, Lymon was able to advance his appeal all the way through the UAW Constitution. At the last stage of the appeals procedure, the independent Public Review Board considered the merits of Lymon's appeal. It determined that the appeal did not have merit because the Local Union did not harbor any animus toward Lymon and Matthews's decision to withdraw the Grievance was justified. (Richardson Decl. ¶ 62, Ex. 8, p. 9-11). Thus, Lymon ultimately did not suffer any negative impact by the alleged lack of notice regarding the Grievance and his UAW Constitution appeal rights.

Respectfully submitted,
**MACEY SWANSON LLP**
/s/ Robert A. Hicks
Robert A. Hicks, Atty. No.  25310-49
Attorney for Defendant Local 2209
429 N. Pennsylvania Street, Suite 204
Indianapolis, IN 46204-1800
Phone: (317)637-2345
Fax:    (317)637-2369
E-mail: rhicks@maceylaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of August 2023 a copy of the foregoing was filed by use of the Court's electronic filing system. Parties may access this document through the Court's electronic filing system.

Additionally, a copy of the foregoing was served by first-class, U.S. mail, postage pre-paid on the 29th day of August 2023 on:

Terry Lymon
2418 Palisade Dr.
Fort Wayne, IN 46806

/s/ Robert A. Hicks

Robert A. Hicks, Attorney No. 25310-49
Attorney for Defendant Local 2209
429 N. Pennsylvania Street, Suite 204
Indianapolis, IN 46204-1800
Phone: (317)637-2345
Fax:    (317)637-2369
E-mail:  rhicks@maceylaw.com